Alex R. Straus (SBN: 321366)
**MILBERG GOLEMAN BYRSON
PHILLIPS GROSSMAN, PLLC**
16748 McCormick Street
Encino, CA 91436-1020
Telephone: (917) 471-1894
Facsimile: (310) 496-3176
Email: astraus@milberg.com

[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| VIJAY GUPTA | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | 1. Violation of the California Unfair Competition Law, California Business & Professions Code § 17200, et seq. |
| Defendant. | 2. Violation of California Labor Code § 2751 |
| | 3. Fraudulent Concealment |
| | 4. Fraudulent Misrepresentation |
| | 5. Negligent Misrepresentation |
| | 6. Quantum Meruit |
| | 7. Unjust Enrichment |
| | 8. Punitive Damages |

Plaintiff Vijay Gupta, complaining of the acts of Defendant International Business Machines Corporation ("IBM"), alleges and states the following:

**INTRODUCTION**

1.     For years, IBM has perpetrated an institutional bait-and-switch with how it pays commissions to sales representatives. Throughout IBM's messaging to them, from how it directs managers to explain commissions to how it uses presentations to highlight the program features, IBM consistently and repeatedly represents that commissions are uncapped. Indeed, IBM's Rule 30(B)(6) witness admitted under oath in depositions in similar lawsuits that IBM has "an obligation" not to cap sales representatives' commissions payments and that it's reasonable for sales representatives to rely on that.

2.     IBM tells sales representatives that ["they"] can make a million dollars!" and that their income is limited only by how much they are able to sell. But that's not the truth. The truth is that IBM frequently does cap commissions. And IBM intentionally misleads sales representatives about the program because it knows that an "uncapped commissions" program is highly motivating to sales representatives and incentivizes them to pursue big deals. On the contrary, capping commissions de-motivates sales representatives because when they reach the cap they can't make any more commissions no matter how big the deal is. And, since a big deal is often extraordinarily difficult to close, requiring long hours and repeated out-of-town travel, IBM knows that being honest about its capped commissions program would significantly limit the number of those big deals.

3.     For years, IBM has known that sales representatives, and even managers, believe IBM when it says commissions are uncapped. In fact, the IBM department that handles capping frequently gets calls from sales representatives and managers that are upset about getting capped after being told that IBM does not cap commissions. Yet, IBM does nothing to attempt to eliminate the problem by explaining its real practice.

4.     The reason IBM doesn't attempt to explain that it caps commissions is simple: profit. As it stands, IBM is able to have its cake and eat it too because it can successfully motivate its sales team to pursue the big deal for IBM, but never have to pay a fair commission for the extraordinary effort the sales representative expended to close it.

5.     Plaintiff Vijay Gupta is another victim of IBM's blatant misrepresentations and doubletalk about uncapped commissions. In June 2019, Plaintiff closed a deal for the sale of IBM products and services to HCL Technologies (HCL). IBM went through its standard review process to confirm the accuracy of the sale amount(s), territories, and quotas, then paid Plaintiff the full amount of commissions calculated by his commissions formulas. Then, over two months later, IBM claimed that they should not have been paid any commissions for the HCL deal. IBM further claimed that a hidden provision in IBM's quota setting guidelines (which are not accessible to sales representatives like Plaintiff) stated that, for reasons known only to IBM, zero commissions would be paid in certain instances

when a deal was over $10,000,000. Mr. Gupta was never told before the deal was closed that IBM didn't intend to pay him sales commissions; to the contrary, IBM told him in writing and orally that he would be paid uncapped commissions on all deals based simply on the amount of sales closed by Mr. Gupta, as he had been paid on similar deals for years. And then, of course, he was actually paid in the normal course of business.

6.      Months later, IBM decided that it should not have paid Mr. Gupta anything for the HCL deal. IBM began a process of withholding other duly earned commissions to offset what IBM decided after-the-fact that it didn't want to pay Mr. Gupta. What IBM has done here violates California law.

7.      In sum, despite promising Mr. Gupta that his commissions were uncapped, IBM capped his commissions by paying him nothing for the HCL deal. He has filed this action to recover the damages he has incurred from IBM's wrongful capping of his sales commissions and to stop IBM's deceptive and unlawful practice.

## **PARTIES**

8.      Mr. Gupta is a citizen of Santa Clara, California, residing in Santa Clara County.

9.      IBM was incorporated, and is existing, under the laws of the State of New York.   IBM's principal place of business is in the State of New York.

## JURISDICTION AND VENUE

10.    Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. § 1332.

11.    This Court has personal jurisdiction over IBM.

12.    Venue is proper in this Court.

13.    This action has been brought within all applicable statute of limitations and/or repose.

## INTRADISTRICT ASSIGNMENT

14.    Pursuant to Civil Local Rule 3-2(c-d), a substantial part of the events giving rise to the claims herein arose in Santa Clara County, California and this action should be assigned to the San Jose Division.

## FACTUAL ALLEGATIONS

15.    Mr. Gupta joined IBM July 2006 as technical specialist and started software sales representative in July 2018. Throughout his time at IBM, Mr. Gupta has been very successful and respected in his position.

### IBM Promised Mr. Gupta His Commissions Were Uncapped.

16.    Mr. Gupta's compensation as an IBM sales representative consisted of a base salary paired with uncapped commissions. Mr. Gupta's commissions consisted of a tiered, uncapped commission based on Mr. Gupta's attainment as a percentage of his quota achieved.

17.    During his time at IBM, Mr. Gupta and other sales representatives regularly received PowerPoint presentations describing the terms of the commission plans being offered to them. These PowerPoints consisted of over 200 pages worth

of slides and are collectively referred to as the "Educational Materials." Each year, the Educational Materials explained that sales commissions were uncapped. Nowhere in the Educational Materials is there anything stating or even suggesting that sales commissions may be capped in some instances or that IBM reserves the right to cancel or modify whether and to what extent commissions may be capped. The Educational Materials are unequivocal and state repeatedly that commissions are uncapped. The Educational Materials were also available for Mr. Gupta, and other salespeople, to download during the entirety of the sales period (January-June of 2019) and afterwards.

18.     Mr. Gupta's commission plan for the first half of 2019 ran from January 1, 2019 through June 30, 2019.

19.     During that same time period in 2019, Mr. Gupta received and reviewed a presentation (the "PowerPoint"), which constituted a portion of the Educational Materials for the first half of 2019. IBM also made the PowerPoint available for Mr. Gupta, and other sales representatives, to download during the entirety of the sales period (January-June 2019) and afterwards, as a resource that they could continually refer back to if they had any questions about their commissions. This PowerPoint constitutes a continuing representation by IBM to sales representatives, including Mr. Gupta, about how they should understand the terms of their commissions compensation.

20.     IBM made a substantially similar version of this PowerPoint available to Mr. Gupta each six months for the purpose of highlighting and explaining the important terms of his compensation.

21.     In 2018, Mr. Gupta received the PowerPoint entitled "Your 2018 Incentive Plan Individual Quota Plan for Sellers" and it stated that the presentation

was the "primary 2018 education for IBM sales employees and managers." It further stated that "[i]t covers the information you will need to understand your 2018 plan."

22.     On slide 6 was the following quote, which pertains to Mr. Gupta's plan type, the Individual Quota Plan:

> Managers are required to assign a territory and quota for each seller on an individual quota plan. Seller earnings for these plans are paid based upon achievement results rather than on an assessment of employee contribution.

23.     In every sales period prior to this one, the substantially similar versions of this presentation included the phrases "earnings opportunities remain uncapped" and "payments uncapped."

24.     However, starting in the first half of 2019, in response to lawsuits filed by the undersigned counsel, IBM removed the phrases "earnings opportunities remain uncapped" and "payments uncapped" from this PowerPoint.

25.     Regardless, IBM's policy remains that sales commissions are uncapped and IBM has testified under oath that sales commissions remained uncapped.

26.     IBM instructs its managers to tell sales employees during the sales kickoff calls at the beginning of each sales period, and the managers actually do tell them, that commissions are uncapped.

27.     In mid-January 2019, Karla Johnson in IBM's Global Sales Incentives department led a conference call designed to explain the commissions plan for the 1H 2019 sales period and answer any questions.

28.     On that call, Johnson went through a PowerPoint representation and represented the following:

    a. Payment on IQPs is straightforward: employees on these plans are paid a percentage of their sales with accelerators for over achievement;

    b. There were no significant changes in 1H 2019 with how commissions will be paid on IQPs and it was "business as usual";

    c. Measurements for commissions must be "ledger-based and automated," meaning that IQP commissions were based on actual sales in the defined territory assigned to sales employees and managers; and

    d. The IQP is "line of sight," which simply means that when the seller sells "x" they earn "y". Said another way, commissions are automatically calculated as a percentage of the sale amount for a deal.

29.     Johnson's department is in charge of commissions plans at IBM and she had authority to make these representations.

30.     Johnson's representations were also IBM's representations because her representations were consistent with IBM's policy regarding how commissions are paid.

31.     The PowerPoint presentation she used also binds IBM because it represents an official statement from IBM about how commissions will be paid.

32.     Maria Lipner, IBM's Vice President of Global Sales Incentives (Karla Johnson's boss) recently confirmed in a deposition in another lawsuit (Beard v.

International Business Machines Corporation, No. 3:18-cv-06783-WHA ("the Beard Action")) that commissions for IQPs were uncapped in 2019.

33.     Lipner testified as follows:

> Q: Okay. Is it your understanding right now that commissions are uncapped at IBM?
> A: That is correct.

(**Exhibit A** [Lipner depo, pp. 68-70]).

34.     Lipner's deposition was taken in October of 2019.

35.     Lipner confirmed this testimony and IBM's uncapped policy when she testified at trial in Kingston v. IBM in April 2021. In *Kingston*, the plaintiff (a sales manager) was fired by IBM for not capping the commissions of a sales representative who closed a large deal. The jury found that by not capping the representative's commissions, Kingston was protecting the employee's wages and his termination violated Washington's law against retaliation in violation of public policy, among other things. He was awarded $11,085,245 by the jury.

36.      The facts of the Beard and Kingston action are, in relevant part when it comes to the promises and policy that IBM does not cap and that commissions are paid based on sales, the same as the facts here. Lipner's testimony that IBM's current practice and policy is not to cap commissions and to pay based on sales applies with equal force to Mr. Gupta. Upon information and belief, IBM's policy and practice, as applicable to Plaintiff, was and is not to cap their commissions and to pay based on sales.

37.   The representations that sales commissions are uncapped were often repeated in sales meetings and by IBM managers, both formally and informally.

38.   Uncapped commissions has been a core component of compensation for sales employees like Mr. Gupta who are on Individual Quota Plans for many years.

39.   Here, Mr. Gupta's commissions were arbitrarily capped for the sole purpose of limiting his earnings in the first half of 2019.

### Mr. Gupta's Commission Payments Were Capped.

40.   In 2019 Mr. Gupta worked on behalf of IBM to close a large deal of IBM services to HCL Technologies ("HCL") that closed in June 2019.

41.   IBM's normal process for paying sales commissions is that commissions are automatically calculated and paid the month after deals are closed.

42.   IBM does not pay commissions based on the total revenue of a deal, but instead on a subset of the revenue, referred to as a commissionable revenue.

43.   Occasionally, on a large deal, IBM will review the commissions to identify any potential mistakes, which if made can make a big difference on a large deal.

44.   Specifically, IBM reviews the territory and quota of anyone earning commissions on a large deal to identify any issues with the quota and territory or any other potential issues with commissions. If no issues are identified, then the commissions should flow business as usual. These reviews can delay commission payments by one month.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

45.    Because of the size of the HCL deal, IBM conducted a review of the deal.

46.    In August 2019, Plaintiff was paid the full amount of commissions as calculated by IBM's commissions formulas, which were contained in the written commissions plans that applied to Plaintiff.

47.    Plaintiff had earned what he was paid in August 2019.

48.    Based on the amount of commissionable revenue from the HCL sale, Mr. Gupta earned $89,627.50 in commissions.

49.    Plaintiff's manager, Nancy Cahey, has similarly filed suit regarding IBM's clawbacks of commissions payments for the HCL deal. *See* <u>Cahey v. International Business Machines Corporation</u>, No. 1:20,cv-00781-NYW (D. Colo.).

**IBM Clawed Back Plaintiff's HCL Commissions**

50.    On two different occasions IBM paid Mr. Gupta commissions that he was owed for the HCL deal, only to take the money back shortly thereafter.

51.    In October 2019, Mr. Gupta noticed in IBM's internal system that IBM had reversed his commissions related to the HCL deal. Mr. Gupta soon learned that they had reversed that with respect to  that he should not have been paid any commissions on the HCL deal and that it intended to claw back the full amount of commissions ($89,627.50) paid to him on that deal.

52.    IBM ultimately clawed back Mr. Gupta's commissions.

53. Then, in October 2020, IBM re-categorized some of the revenue that had been part of the HCL deal, and Mr. Gupta was paid an additional commissions payment of $51,648.08.

54. After he was paid, IBM reversed the $51,648.08 commissions payment, again capping Mr. Gupta's commissions.

**Mr. Gupta Has Recently Learned That IBM**
**Routinely Misrepresents That It Does Not Cap Commissions**

55. Recently, Mr. Gupta has learned that IBM has a history of capping commissions.

56. The sales field in which Mr. Gupta worked for IBM is highly competitive, and most employers do not cap commissions. Were IBM to actually tell its sales representatives that commissions could be capped, it would be severely hampered in its efforts to recruit good sales representatives. As a result, IBM engages in a practice whereby it tells its salespeople that their commissions will not be capped, both verbally and in written documents like the PowerPoint presentation, and then it caps certain high achievers after the fact.

57. There are other cases that have been filed around the country, including in the Middle District of North Carolina and the Northern District of California, that are very similar to this one and that have yielded significant discovery. One of those cases is Bobby Choplin v. International Business Machines Corporation, No. 16-cv-1412-TDS-JEP ("the Choplin Action"), which was recently resolved. The plaintiff in the Choplin Action had an IPL that was in relevant part

identical or substantially similar to Mr. Gupta's IPL, and the plaintiff was historically shown PowerPoint presentations that were in relevant part identical or substantially similar to the PowerPoint presentations shown to Mr. Gupta. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Choplin, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Gupta, and what IBM actually paid him and why.

58.    In the Choplin Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit B**); (2) a deposition of Mr. Choplin's first-line (i.e., immediate) manager, Thomas Batthany (**Exhibit C**); (3) a deposition of Mr. Choplin's second-line (i.e., two levels up) manager, Haleh Maleki (**Exhibit D**); and (4) a deposition of Mark Dorsey, a former IBM Vice President of Software Sales (i.e., one of the highest-level sales managers in the corporation) (**Exhibit E**).  Together, Exhibits B, C, D, and E are referred to as the "Choplin Depositions." All of this testimony taken under oath in the Choplin case, including the testimony quoted below, applies equally and fully to Mr. Gupta here.

59.    The testimony in the Choplin Depositions make clear the following, among other things: (1) while IBM asserts that it has a policy of not capping commissions, the reality is that it does cap commissions; (2) sales representatives like Mr. Gupta were entitled to rely on IBM's policy their commissions would be not

be "capped," and that reliance was understood by IBM and was reasonable; and (3) what IBM in fact did, when it reduced the commissions in the way that it did for Mr. Choplin and Mr. Gupta, was "capping."

60.     The Choplin Depositions also make clear that, despite IBM's claim that it did not "cap" Mr. Choplin's commission when it reduced his commission payments, IBM employees used that exact term several times in emails when discussing the reduction in Mr. Choplin's commission payments.

61.     Indeed, an email was produced in the Choplin case where Randolph Moorer specifically "recommend[ed] capping" the commissions of another sales representative, Mr. Stephenson, on both the LabCorp and BB&T Deals by approximately $600,000. (**Exhibit F**).

62.     IBM's Rule 30(b)(6) designee in the Choplin case testified that IBM is not "capping" commissions, only "adjusting" them. (Exhibit B, p. 45). He further testified that "as long as IBM's adjustments are to a specific deal and not all deals, IBM's position is that's not a cap." (Exhibit B, p. 107).

63.     Contrary to Mr. Martinotti's testimony on behalf of IBM, other IBM employees, including managers, executives, and sales representatives, are totally unaware of the distinction that IBM attempts to make between a "cap" and an "adjustment" and almost exclusively refer to what IBM does as "capping" or a "cap" on commissions. (Exhibit C, p. 43; Exhibit D, p. 27; and Exhibit F). Indeed, as noted above, they use that exact word in their internal emails.

64.     IBM claims that this usage of the word "cap" is a "mistake." (Exhibit B, p. 119). On behalf of IBM, Mr. Martinotti testified that sales representatives, managers, and other executives within IBM commonly use the term "capped" but should not be using that term; they should be using the term "adjusted" instead. Specifically, he testified:

> Q:    Have you had anyone at IBM come to you after an adjustment and say, you know, "IBM capped me on this deal?"
> A:    And I would go back to them and say that they didn't cap you; they adjusted you.
> Q.    Okay. So, first, let me – that has happened?
> A.    Yes.
> Q.    Okay. So you would agree there is some confusion about the difference between a cap and an adjustment of commissions?
> A.    The answer is yes, there is confusion or, said differently, they use the term interchangeably incorrectly.
> Q.    Who is "they"?
> A.    The sales representatives.
> Q.    Okay, okay. You think – and managers too right?
> A.    Right. **Every adjustment they consider to be a cap**, and that's no – you know, a cap is not an adjustment and adjustment is not a cap.

(Exhibit B, p. 108) (emphasis added).

65.     IBM also testified that executives such as Mr. Moorer (the executive actually responsible for determining whether and how much to cap Mr. Choplin's commissions on the BB&T Deal), are similarly mistaken when they use the term cap:

> Q:    So Mr. Moorer here is using the word "cap" and "capping" isn't he?
> A:    Correct. He is using the word "capping."
> Q.    Okay. He is making that mistake that you would correct him on, right?
> A.    Exactly.
> Q.    But Mr. Moorer is the one – is one of the people who exercises judgment on those of how much or how little to pay in commissions, right?

COMPLAINT
Page 15 of 38

1

A.    Yes.

2

(Exhibit B, pp. 119-120).

3

66.    Despite IBM's contention that its sales representatives, managers, and

4

executives are all "confused" and "mistaken" when they refer to IBM's conduct as

5

"capping" commissions, IBM makes no efforts to clarify the confusion in its 200

6

pages of Educational Materials. (Exhibit B, pp. 80-82). Indeed, none of the

7

Educational Materials (where IBM repeatedly promises commissions are uncapped)

8

contain any qualifiers or fine print of any kind.

9

67.    IBM does not clarify this confusion because it knows that if sales

10

representatives knew that IBM might cap their commissions, it would demotivate

11

the representatives and lead to lower sales for IBM. (Exhibit B, p. 158).

12

68.    IBM has even been told by its managers that it cannot continue to

13

make representations like that in light of IBM's actual practices. One manager, Tom

14

Batthany, wrote an email protesting IBM capping the commissions of a sales

15

representatives he managed, where he says: "We can no longer have folks stand in

16

the front of the room and say reps make $1 million and there are no caps." (**Exhibit**

17

**G**).

18

69.    Another recently resolved case in the Middle District of North Carolina

19

that is very similar to this one and that has yielded discovery is <u>William Stephenson</u>

20

<u>v. International Business Machines Corporation</u>, No. 17-cv-1141 ("the Stephenson

21

Action"). Upon information and belief, the plaintiff in the Stephenson Action had an

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IPL that was in relevant part identical or substantially similar to Mr. Gupta's IPL. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Stephenson, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Gupta, and what IBM actually paid him and why.

70.    In the Stephenson Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit H**); (2) a deposition of Mr. Stephenson's first-line (i.e., immediate) manager, Benjamin Blackwell (**Exhibit I**); (3) a deposition of Mr. Stephenson's second-line (i.e., two levels up) manager, Cleo Clarke (**Exhibit J**); and (4) a deposition of Randolph Moorer, a high-level IBM executive (**Exhibit K**).  Together, Exhibits H, I, J, and K are referred to as the "Stephenson Depositions."

71.    The witnesses in the Stephenson Depositions, including Mr. Martinotti on behalf of IBM, re-affirmed the truth of the key testimony and admissions in the Choplin Depositions, including those portions quoted above.

72.    Furthermore, Mr. Martinotti testified that much of his testimony in the Choplin case would "apply equally" in Stephenson's case because the relevant facts—the PowerPoints historically provided, the IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases.  The relevant facts in this case are same as those in both the Choplin case and the Stephenson case, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

73.    The Stephenson Depositions establish the following facts, among many others: (a) while IBM asserts that it has a policy of not capping commissions, the reality is that it does cap commissions; (b) the witnesses testified that IBM does not lie, and therefore that it is reasonable for salespeople to believe what IBM says—including its representation that "earnings opportunities" and "payments" were "uncapped"; (c) in fact, IBM testified that salespeople can "take that to the bank" when IBM says that it does not cap and that it's "not foolish" for them to believe that, and that IBM has an "obligation" not to cap as a result; (d) internal IBM emails stated many times that IBM was "capping" Stephenson when it reduced his commissions as it did; (e) nowhere did IBM ever define "cap," although the witnesses testified that "capping" can occur when IBM reduces a commission on one specific deal; (f) IBM admitted that, at the very least, "reasonable minds could differ about how they use or understand the term 'cap' or 'capping'"; (g) IBM reduced Stephenson's commissions in order to satisfy a secret internal budget of commissions, based on a percentage of a deal's revenue—that is, the sole reason that Stephenson's commissions were reduced and the amount of the reduction were both based only on IBM's desire to reduce the amount of commissions payable to satisfy the budget; (h) IBM focused on the "high earners" and "high achievers" when deciding whom to cap, and not, for example, on those who worked less hard relative to their peers or whose commission was disproportionate to their work; (i) IBM did not purport to cap or actually cap Mr. Stephenson based on the Significant

Transactions Provision of the IPL (j) one of the witnesses testified that what IBM did to Stephenson surprised her and did not "make sense" to her; (k) Martinotti, on behalf of IBM, testified that he did not see the emails about the reasons for Mr. Stephenson's commissions reduction until his deposition and that he did not "agree" with capping to stay on budget and that doing so would be "questionable"; and (l) Mr. Stephenson's commissions were actually "earned" under the terms of the IPL when he was capped.

74.    The testimony in the prior paragraph applies equally to Mr. Gupta, and in any event Mr. Gupta alleges that: (a) he was reasonable to rely on IBM's promise that it would not cap him; and (b) when IBM reduced his commission, it "capped" him, just like Mr. Stephenson was capped.

75.    Another case that was filed in the Northern District of California, that is very similar to this one and that has yielded discovery is David Swafford v. International Business Machines Corporation, No. 18-cv-4916 ("the Swafford Action"). The plaintiff in the Swafford Action had an IPL that was in relevant part identical or substantially similar to Mr. Gupta's IPL, and the plaintiff was historically show PowerPoint presentations with representations that were in relevant part identical or substantially similar to the representations made to Mr. Gupta. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Swafford, and what IBM

1
2

actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Gupta, and what IBM actually paid him and why.

3
4
5
6
7
8
9
10
11

76.    In the Swafford Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit L**); (2) a deposition of Mr. Swafford's first-line (i.e., immediate) manager, Mark Briggs (**Exhibit M**); (3) a deposition of Mr. Swafford's second-line (i.e., two levels up) manager, Richard Wirtenson (**Exhibit N**); and (4) a deposition of Donald Leeke, a high-level IBM executive (**Exhibit O**). Together, Exhibits L, M, N, and O are referred to as the "Swafford Depositions."

12
13
14
15
16

77.    The witnesses in the Swafford Depositions, including Mr. Martinotti on behalf of IBM, re-affirmed the truth of the key testimony and admissions in the Choplin Depositions and the Stephenson Depositions, including those portions quoted above.

17
18
19
20
21
22
23
24
25

78.    Furthermore, Mr. Martinotti testified that much of his testimony in the Choplin case and the Stephenson case would "apply equally" in Swafford's case because the relevant facts—the PowerPoints historically provided, the IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases.  The relevant facts in this case are same as those in both the Choplin case and the Stephenson case, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

26
27
28

79.     The Swafford Depositions establish facts that are similar or identical to those established in the Choplin Depositions and Stephenson Depositions, as outlined above. Most importantly, they establish: (a) that Swafford was reasonable in relying on IBM's representation that it would not "cap" his commission; and (b) that IBM "capped" him when they reduced his commissions.

80.     The key testimony in the Swafford Depositions applies equally to Mr. Gupta and in any event Mr. Gupta alleges that: (a) he was reasonable to rely on IBM's promise that it would not cap him; and (b) when IBM reduced his commission, it "capped" him, just like Mr. Swafford was capped.

81.     And another case that was filed in the Northern District of California, that is very similar to this one and that has yielded discovery is <u>Jerome Beard v. International Business Machines Corporation</u>, No. 18-cv-06783 ("the Beard Action"). The plaintiff in the Beard Action also had an IPL that was in relevant part identical or substantially similar to Mr. Gupta's IPL, and the plaintiff was historically shown PowerPoint presentations with representations that were in relevant part identical or substantially similar to the representations IBM made to Mr. Gupta. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Beard, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Gupta, and what IBM actually paid him and why.

82. The witnesses in the depositions in Beard also re-affirmed the truth of the key testimony and admissions in the Choplin Depositions and the Stephenson Depositions, including those portions quoted above.

83. Furthermore, IBM executive Inhi Cho Suh testified that much of the testimony in the Choplin case and the Stephenson case would "apply equally" in Beard's case because the relevant facts—the PowerPoints historically provided, the IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases. The relevant facts in this case are same as those in both the Choplin case and the Stephenson case, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

84. The Beard Depositions established facts that are similar or identical to those established in the Choplin Depositions, Stephenson Depositions, and Swafford Depositions, as outlined above. Most importantly, they establish: (a) that Beard was reasonable in relying on IBM's representation that it would not "cap" his commission; and (b) that IBM "capped" him when they reduced his commissions.

85. The key testimony in the Beard Depositions applies equally to Mr. Gupta and in any event Mr. Gupta alleges that: (a) he was reasonable to rely on IBM's promise that it would not cap him; and (b) when IBM reduced his commission, it "capped" him, just like Mr. Beard was capped.

86. In short, of all of the cases alleging facts similar to those alleged in this case, eight have yielded significant discovery, two of which proceeded in the

Northern District of California. In all of the cases, the discovery has shown that the key facts alleged were in fact true—and those facts apply equally in this case.

87. Mr. Gupta has met all conditions precedent to the bringing of this action.

## FIRST CLAIM FOR RELIEF
### (Violation of the California Unfair Competition Law)

88. Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

89. Defendant is a "person" as defined under California Business & Professions Code Section 17021.

90. California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." IBM has engaged in unlawful, unfair, and fraudulent business acts and practices in violation of the UCL.

91. IBM's conduct, as described herein, was and is in violation of the UCL. IBM's conduct violates the UCL in at least the following ways:

    a. by knowingly misrepresenting to Mr. Gupta the uncapped nature of his sales commissions;

    b. by willfully failing to pay all earned commissions wages to Mr. Gupta;

    c. by duping Mr. Gupta into working on the HCL Deal without being paid commissions; and

    d. by violating other California laws, including but not limited to, California Labor Code Section 2751.

92.     IBM's specific conduct set forth in this complaint is unfair and violates Section 17200.

93.     Furthermore, any failure to pay wages is, by definition, an unfair business practice under Section 17200.

94.     IBM's conduct alleged herein caused Plaintiff to sell as many of IBM's products and services as he could, often at the expense of quality time with his family that he would not otherwise have sacrificed had he known that IBM would not pay him the commissions he earned.

95.     Accordingly, Plaintiff has suffered injury in fact including lost money as a result of Defendant's misrepresentations.

96.     IBM should be made to disgorge these ill-gotten gains and to restore to Mr. Gupta the wrongfully withheld wages to which he is entitled, as well as interest on these wages.

97.     As alleged above, Labor Code Section 2751 states, in pertinent part: "Whenever an employer enters into a contract of employment with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and set forth the method by which the commissions shall be paid."  The statute also provides that an employer must give a "signed" copy of the contract to the employee and obtain a receipt for the contract from the employee.

98.    As alleged above, IBM violated section 2751 because the IPL undisputedly is not a contract, and therefore it is not sufficient under section 2751, and there is no other document that is a written contract sufficient under section 2751.   Furthermore, IBM violated section 2751 because IBM did not sign any sufficient contract (and it did not sign the IPL), nor did IBM obtain a receipt from Gupta for his receipt of any written contract.

99.    A violation of section 2751, can serve as a predicate violation for a claim under the UCL. Plaintiff alleges a claim against IBM for violation of the UCL for its unlawful conduct in violating the provision of section 2751, as outlined above.

100.    Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendant under Cal. Bus. & Prof. Code § 17200 *et seq.*

101.    Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin IBM from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below, including, but not limited to Plaintiff's attorneys' fees.

## SECOND CLAIM FOR RELIEF
### (Direct Claim for Violation of California Labor Code § 2751)

102.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

103. California Labor Code Section 2751 states, in pertinent part: "Whenever an employer enters into a contract of employment with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and set forth the method by which the commissions shall be paid."

104. As alleged above, IBM violated section 2751 because the IPL undisputedly is not a contract, and therefore it is not sufficient under section 2751, and there is no other document that is a written contract sufficient under section 2751. Furthermore, IBM violated section 2751 because IBM did not sign any sufficient contract (and it did not sign the IPL), nor did IBM obtain a receipt from Plaintiff for his receipt of any written contract.

105. IBM's actions alleged herein caused Plaintiff to sell as many of IBM's products and services as he could, often at the expense of quality time with his family that he would not otherwise have sacrificed had he known that IBM would not pay him the commissions that he earned.

106. Accordingly, Plaintiff has suffered injury in fact including, including lost money, as a result of IBM's failure to have enforceable written contracts—which presumably IBM would have complied with, but which could be the basis for an easy breach of contract claim if it did not. Put another way, the obvious purpose of California Labor Code Section 2751's requirement of a written contract is to legally obligate employers to specify how commissions will be paid and pay them. If an

employer violates California Labor Code Section 2751 by not having such a contract, then its employees are harmed because the employer is not obligated to specify and pay commissions under such a contract. Here, if IBM had complied with California Labor Code Section 2751, it would have had an enforceable contract with Plaintiff; IBM would have complied with that contract, or its employees could easily sue if IBM did not, and either way the Plaintiff would be in a better situation.

107.    Pursuant to California Labor Code §§ 200 et seq., as a result of IBM's violation of section 2751, Plaintiff is entitled to recover damages, with interest, attorneys' fees, costs, and penalties all in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
**(Fraudulent Concealment – HCL Deal)**

108.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

109.    IBM, through its agents, initially concealed from Plaintiff that it intended to cap his commissions through the $10 million exception in the Quota Setting Guidelines.

110.    IBM knew that Plaintiff had no access to review these Quota Setting Guidelines and no ability to learn of its intentions to cap his commissions.

111.    IBM intended to deceive Plaintiff by omitting this material information. Simply put, IBM knew it intended to not pay Plaintiff for the closure

of the HCL deal, yet it did not tell Plaintiff because it wanted Plaintiff to close the deal and generate revenue for IBM.

112.    Had IBM disclosed this provision to Plaintiff, he would have altered his work performance and broken the deal into smaller contracts to avoid this threshold or worked on other accounts where he would have been paid the sales commissions he earned.

113.    Had Plaintiff known that he would not be paid what he was promised and what he expected, he would have worked differently at IBM, in commensuration with his actual compensation, and/or he would have sought other jobs that paid him what his efforts were worth and/or did not cap commissions. Had Plaintiff known that he would be capped, he would have worked his deals differently at IBM to maximize his compensation.

114.    IBM had a duty to speak because (a) it chose to speak by telling Plaintiff and others that their commissions would not be capped, thereby taking on a duty to make a full and fair disclosure of facts concerning the matters on which IBM chose to speak; and (b) it took affirmative steps to conceal material facts from Plaintiffs. IBM failed to fulfill that duty to speak and make a full and fair disclosure of the facts. IBM concealed the facts with the intent to deceive Plaintiffs, who were in fact deceived. Plaintiff justifiably relied on IBM's silence about those facts, and he was injured as a result of IBM's fraudulent concealment.

115.    IBM also represented that:

a. Payment on IQPs is straightforward: employees on these plans are paid a percentage of their sales with accelerators for over achievement;

b. There was no significant changes in 1H 2019 with how commissions will be paid on IQPs and it was "business as usual";

c. Measurements for commissions must be "ledger-based and automated," meaning that IQP commissions were based on actual sales in the defined territory assigned to sales employees and managers; and

d. The IQP is "line of sight," which simply means that when the seller sells "x" they earn "y." Said another way, commissions are automatically calculated as a percentage of the sale amount for a deal.

116. Those representations were false when made and IBM, through its agents, knew that they were false when made. IBM intended to deceive Mr. Gupta in making those misrepresentations. Simply put, IBM knew that Mr. Gupta's commissions might be and would be capped, even though it told him in all of these instances that they would not be capped.

117. Mr. Gupta reasonably and justifiably relied on the representations of IBM.

118. The reasonableness of Mr. Gupta's reliance is supported by, among other things, the admissions in the Choplin case by IBM, Mr. Choplin's two managers, and former IBM executive Mark Dorsey; the admissions in the Stephenson case by IBM and Mr. Stephenson's three managers; the admissions in

the Swafford case by IBM and Mr. Swafford's three managers; and the admissions in the Beard case by IBM and IBM executive Inhi Cho Suh. Each of these individuals, and IBM itself, admitted that it was reasonable for a sales representative to rely on IBM's representations that commissions were uncapped. Moreover, Mr. Choplin, Mr. Stephenson, and Mr. Swafford also testified that they relied on the same promises of uncapped commissions as Mr. Gupta, which further supports the reasonableness of Mr. Gupta's reliance.

119.    Mr. Gupta was damaged by IBM's fraudulent statements with respect to how he would be paid on the HCL Deal in an amount exceeding $75,000.

### FOURTH CLAIM FOR RELIEF
### (Fraudulent Misrepresentation – HCL Deal)

120.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

121.    IBM, through its agents, misrepresented IBM's policy that commissions were uncapped.

122.    IBM continuously represented that earnings under IQP's were "paid based on achievement results" and that commissions were "uncapped."

123.    Because IBM has capped Plaintiff's commissions and did not pay him based on his achievement results, representing that its policy that commissions are uncapped was false, or alternatively, a concealment or nondisclosure of the reality of IBM's intentions.

124.   IBM knew that its representation that it did not cap commissions and its representation that IQP's were "paid based on achievement results" were false.

125.   IBM intended to deceive Plaintiff by misrepresenting this material information. IBM knew that it intended to not pay Plaintiff for the closure of the HCL Deal, yet it did not tell Plaintiff because it wanted Plaintiff to close the deal and generate revenue for IBM.

126.   IBM also represented that:

    a.   Payment on IQPs is straightforward: employees on these plans are paid a percentage of their sales with accelerators for over achievement;

    b.   There was no significant changes in 1H 2019 with how commissions will be paid on IQPs and it was "business as usual";

    c.   Measurements for commissions must be "ledger-based and automated," meaning that IQP commissions were based on actual sales in the defined territory assigned to sales employees and managers; and

    d.   The IQP is "line of sight," which simply means that when the seller sells "x" they earn "y." Said another way, commissions are automatically calculated as a percentage of the sale amount for a deal.

127.   Plaintiff relied on IBM's representations, as he had for many years.

128.   Plaintiff's reliance on IBM's representations was justified and reasonable.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

129.   Had IBM disclosed that commissions were capped, and that Plaintiff would only earn his salary, Plaintiff would have altered how he performed his work.

130.   The reasonableness of Mr. Gupta's reliance is supported by, among other things, the admissions in the Choplin case by IBM, Mr. Choplin's two managers, and former IBM executive Mark Dorsey; the admissions in the Stephenson case by IBM and Mr. Stephenson's three managers; the admissions in the Swafford case by IBM and Mr. Swafford's three managers; and the admissions in the Beard case by IBM and IBM executive Inhi Cho Suh. Each of these individuals, and IBM itself, admitted that it was reasonable for a sales representative to rely on IBM's representations that commissions were uncapped. Moreover, Mr. Choplin, Mr. Stephenson, and Mr. Swafford also testified that they relied on the same promises of uncapped commissions as Mr. Gupta, which further supports the reasonableness of Mr. Gupta's reliance.

131.   Plaintiff was damaged by IBM's fraudulent misrepresentations in an amount exceeding $75,000.

### FIFTH CLAIM FOR RELIEF
**(Alternative Claim - Negligent Misrepresentation – HCL Deal)**

132.   Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

133.   Mr. Gupta alleges this claim in the alternative to the claim for fraudulent misrepresentation.

134.   IBM, through its agents, concealed from Plaintiff the hidden provision of the Quota Setting Guidelines.

135.   IBM's agents made this omission/concealment negligently, without exercising the care that a reasonable person would exercise in the circumstances. IBM made the representations with the knowledge and intention that Plaintiff change their efforts had they known the truth about the hidden provision of the Quota Setting Guidelines, and Plaintiff reasonably and justifiably relied on the representations of IBM by, among other things, continuing to work hard and sell as much software and services as possible for the benefit of IBM.

136.   Had Plaintiff known that he would not be paid what they were promised and what he expected, he would have worked differently at IBM, in commensuration with their actual compensation, and/or they would have sought other jobs that paid them what their efforts were worth and/or did not cap commissions. Had Plaintiff known that they would be capped as they were, he would have worked his deals differently at IBM so as to maximize their compensation.

137.   IBM also represented that:

   a.   Payment on IQPs is straightforward: employees on these plans are paid a percentage of their sales with accelerators for over achievement;

   b.   There was no significant changes in 1H 2019 with how commissions will be paid on IQPs and it was "business as usual";

c.   Measurements for commissions must be "ledger-based and automated," meaning that IQP commissions were based on actual sales in the defined territory assigned to sales employees and managers; and

d.   The IQP is "line of sight," which simply means that when the seller sells "x" they earn "y." Said another way, commissions are automatically calculated as a percentage of the sale amount for a deal.

138.   IBM owed Plaintiff a duty of care in making the representations.

139.   Plaintiff reasonably and justifiably relied on the representations of IBM.

140.   Plaintiff was damaged by IBM's negligent misrepresentations.

141.   Plaintiff has been damaged by IBM's negligence in an amount exceeding $75,000.00.

## SIXTH CLAIM FOR RELIEF
### (Alternative Claim – Quantum Meruit)

142.   Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

143.   Mr. Gupta rendered valuable consideration to IBM, in the form of work performed to close the HCL deals, for which he has not been paid. The consideration has a reasonable value of over $75,000, although the exact amount is for the jury.

144.   At the time that Mr. Gupta performed the work for both of these deals he reasonably expected to be paid by IBM.  IBM received and benefited from the

work with knowledge or reason to know that Mr. Gupta expected to be paid. IBM voluntarily accepted the benefit of the work and kept the benefits therefrom without waiving, refusing, or returning the benefit.

145.    Mr. Gupta is entitled under the doctrine of quantum meruit to recover damages from IBM in the amount of *at least* $75,000.

## SEVENTH CLAIM FOR RELIEF
### (Alternative Claim - Unjust Enrichment)

146.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

147.    At the specific request of IBM and for its use and benefit, Mr. Gupta has performed work for IBM in the form of making sales of its software and services to HCL.

148.    The value of the work performed for IBM by Mr. Gupta for which he has not been paid is *at least* $75,000, although the exact amount is for the jury.

149.    During and since the performance of the work by Mr. Gupta, IBM has failed to pay him and there is due and owing to Mr. Gupta from IBM, a principal sum amount of *at least* $75,000.

150.    Despite Mr. Gupta being owed in excess of $75,000, IBM has failed and refused to pay the same or any part of it.

151.    As a result of IBM's refusal to pay Mr. Gupta the above-stated sum due and owing to him, IBM has become unjustly enriched in the amount of *at least* $75,000.

### EIGHTH CLAIM FOR RELIEF
#### (Punitive Damages)

152.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

153.    The actions and conduct of IBM, as set forth herein, entitle Mr. Gupta to compensatory damages, and are accompanied by aggravating factors which caused and relate to Mr. Gupta's injuries which give rise to his claim for compensatory damages.

154.    This conduct, as set forth herein, includes, among other things, fraud.

155.    IBM facilitated the conduct constituting fraud and the willful, wanton, and outrageous conduct giving rise to punitive damages, as set forth herein and otherwise.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Gupta prays the Court for the following relief:

1.    That Mr. Gupta have and recover from IBM for violations of the California Labor Code in an amount exceeding $75,000, plus interest, costs, and attorneys' fees as allowed by law;

2.    That Mr. Gupta have and recover from IBM for violations of the California Unfair Competition Law injunctive relief authorized by Business and Professions Code Sections 17202 and 17203 and restitution of his improperly

withheld commissions, including interest, costs, and attorneys' fees as allowed by law;

3.     That Mr. Gupta have and recover from IBM for fraudulent concealment in an amount exceeding $75,000, and interest and costs as allowed by law;

4.     That Mr. Gupta have and recover from IBM for fraudulent misrepresentation in an amount exceeding $75,000, and interest and costs as allowed by law;

5.     That Mr. Gupta have and recover from IBM for negligent misrepresentation in an amount exceeding $75,000, and interest and costs as allowed by law;

6.     That Mr. Gupta have and recover from IBM for quantum meruit or unjust enrichment in an amount to be determined at trial, plus interest on the judgment until paid in full at the legal rate as allowed by law;

7.     That Mr. Gupta be awarded attorneys' fees pursuant to California Labor Code § 218.5;

8.     That Mr. Gupta be awarded punitive damages;

9.     That all costs of this action be taxed against IBM; and

10.    That the Court award Mr. Gupta such other and further relief as this Court may deem just and proper.

## JURY DEMAND

PLAINTIFF DEMANDS A TRIAL BY JURY.

Respectfully submitted, this the 2nd day of June 2021.

/s/ Alex R. Straus
Alex R. Straus (SBN: 321366)
**MILBERG GOLEMAN BYRSON
PHILLIPS GROSSMAN, PLLC**
16748 McCormick Street
Encino, CA 91436-1020
Telephone: (917) 471-1894
Facsimile: (310) 496-3176
Email: astraus@milberg.com

Matthew E. Lee*
Jeremy R. Williams*
**MILBERG GOLEMAN BYRSON
PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
mlee@milberg.com
jwilliams@milberg.com

Mark R. Sigmon*
**SIGMON LAW, PLLC**
5 West Hargett Street, Suite 1001
Raleigh, North Carolina 27601
Telephone: (919) 451-6311
Facsimile: (919) 882-9057
mark@sigmonlawfirm.com

*Counsel for Plaintiff*

* motion for admission *pro hac vice*
forthcoming